1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4     DANA-FARBER CANCER INSTITUTE,      )
                                         )
5                      Plaintiff,        )
                                         )
6                                        )  No. 1:10-cv-11613-DPW
      vs.                                )
7                                        )
                                         )
8     GATEKEEPER PHARMACEUTICALS,        )
      INC., ET AL,                       )
9                                        )
                       Defendant.        )
10

11
      BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
12

13
                          MOTION HEARING
14

15

16
                John Joseph Moakley United States Courthouse
17                          Courtroom No. 1
                           One Courthouse Way
18                         Boston, MA 02210
                       Wednesday, January 11, 2012
19                             2:30 p.m.

20

21

22                    Brenda K. Hancock, RMR, CRR
                        Official Court Reporter
23        John Joseph Moakley United States Courthouse
                           One Courthouse Way
24                         Boston, MA 02210
                             (617)439-3214
25

1    APPEARANCES:

2          MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, PC
           By:  Meredith M. Leary, Esq.
3                William C. Brashares, Esq.
           701 Pennsylvania Ave, N.W., Suite 900
4          Washington, DC 20004
           On behalf of Dana-Farber Cancer Institute.
5
           KING & SPALDING
6          By:  Timothy T. Scott, Esq.
           333 Twin Dolphin Drive, Suite 400
7          Redwood Shores, CA 94065
                - and
8          MURPHY & KING, PC
           By:  Theodore J. Folkman, Esq.
9          One Beacon Street, 21st Floor
           Boston, MA 02108
10         On behalf of Gatekeeper Pharmaceuticals, Inc.

11         WILMER HALE LLP
           By:  Lisa J. Pirozzolo, Esq.
12               Heather E. Price, Esq.
           60 State Street
13         Boston, MA 02109
           On behalf of Novartis Institutes for Biomedical
14         Research, Inc.

15

16

17

18

19

20

21

22

23

24

25

1              (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Wednesday, January 11, 2012):

7              THE CLERK:  All rise.

8         (The Honorable Court entered the courtroom at 2:30 p.m.)

9              THE CLERK:  This Honorable Court is now in session.

10    You may be seated.

11             This is Civil Action 10-11613, Dana-Farber Cancer

12    Institute versus Gatekeeper Pharmaceuticals.

13             Will counsel please identify themselves for the

14    record.

15             MR. BRASHARES:  William Brashares for Dana-Farber

16    Cancer Institute.

17             MR. SCOTT:  Good afternoon, your Honor.  Timothy

18    Scott.  With me also in the courtroom is John Chant, CEO of

19    Gatekeeper, and Ted Folkman.

20             MS. PIROZZOLO:  Lisa Pirozzolo from Wilmer Hale for

21    Novartis, and with me is Heather Price.  Dr. Barish Ozdamar has

22    passed the bar in New York but is not admitted yet.  Does your

23    Honor mind if he sits at counsel table?

24             THE COURT:  No.  You vouch for him.  We know where to

25    find you.

1          MS. PIROZZOLO:  Thank you, your Honor.

2          THE COURT:  Is he going to have a speaking part?

3          MS. PIROZZOLO:  No.

4          THE COURT:  Well, I kind have had the feeling that

5    there were ships passing in the night as I went through the

6    briefing in this case, and I struggled to try to figure out how

7    to focus the issues here.

8               I think, at least at the outset, it turns on the

9    question of what "in part" means in this context, and the

10   parties do not seem to have a theory of that, at least one that

11   is grounded for me.  The Gatekeeper approach seems to be

12   intensely fact-based, which is helpful, but there has to be a

13   theme to that pudding, and the Novartis approach is -- perhaps

14   it is too much to call it ethereal, but it does not really grab

15   the issues carefully, from my perspective.

16              So, I guess I would like to start by just

17   understanding what the parties think "in part" means as a

18   definition or almost a matter of construction in this setting.

19              So, maybe, Ms. Pirozzolo, I will start with you.

20              MS. PIROZZOLO:  Yes, your Honor.  Well, of course "in

21   part" is in the definition of "program technology," and we

22   believe it means what it says, that the definition of "program

23   technology" covers technology invented, discovered or developed

24   in whole or in part by the Institute Program participant, which

25   is --

1          THE COURT:  And are conceived or reduced to practice

2    as part of a Funded Research Project.

3          MS. PIROZZOLO:  That's correct.

4          THE COURT:  Both features have to be present.  But

5    what does that mean?  I can use a homely analogy, just to

6    perhaps structure it a bit, by saying the man who gives you the

7    map to Treasure Island is probably within "in part;" the guy

8    who tells you that Treasure Island is in Michigan probably is

9    not, or at least I would think so, unless everything that

10   touches it is "in part".

11         So, how do I draw the line?  It means what it says.

12   All right.  This is like saying, "The document speaks for

13   itself," and I look down at the document and say, "All right,

14   talk to me, document."

15                         (Laughter)

16         MS. PIROZZOLO:  Well, I can tell you how we interpret

17   the phrase in a way that is relevant to this case.  Dr. Eck is

18   a coinventor of the patent application at issue, so he is

19   clearly an Institute Program participant.  So, the invention

20   here was clearly invented, at least in part, by Dr. Eck,

21   because is a coinventor of the patent.

22         THE COURT:  But so what?  Is he tainted.  Is there a

23   bill of attainder that attaches to him for whatever he does?

24   Then I guess we focus on the question of what it means to

25   conceive and reduce to practice as part of the funded research

1    project.

2         MS. PIROZZOLO:  And I think that's exactly right.  So,

3    our position is that Dr. Eck and Dr. Gray were both program

4    participants.  So, clearly the invention was invented,

5    discovered or developed at least in part by people obtaining

6    funding from Novartis, and our position is -- and I am happy to

7    walk through it; we have prepared slides which I hope aren't

8    ethereal and I hope are focused -- that the invention was

9    certainly conceived as part of a funded research project, and

10   I'm happy to walk through --

11        THE COURT:  I am going to go to that in a minute, but

12   I want to just seize the first part of that, and that is that

13   if an Institute Program participant participates in the

14   invention or the discovery or the development, then the "in

15   part" is met; is that it?

16        MS. PIROZZOLO:  Yes.  Well, the "in part", yes, that

17   part of the phrase, and then you have the second part of the

18   definition that has to be conceived.

19        THE COURT:  And I will get to that.  So, back to my

20   attainder analogy, that it is an attainder.  Once you have got

21   a program, Institute Program participant, anything that you are

22   involved in that touches on invention and discovery and

23   development is included in "in part"?

24        MS. PIROZZOLO:  If it means the latter part of the

25   definition as well.

1          THE COURT:  But we will do it in two parts.

2          MS. PIROZZOLO:  Yes, your Honor.

3          THE COURT:  So, let me take it a bit further.  The

4     individual who is an Institute Program participant is drawn

5     into this no matter how minimal his role in the invention or

6     the discovery or development is, right?

7          MS. PIROZZOLO:  Well, he is drawn into the first part

8     of the definition only, yes.

9          THE COURT:  All right.  In for a dime, in for a

10    million dollars.

11         MS. PIROZZOLO:  It means you are going to look at the

12    second part to see if that person played a role in conception

13    or reduction to practice.

14         THE COURT:  Now, let me just stop and see whether

15    Gatekeeper has any refinement to that.

16         MR. SCOTT:  I think that there are two prerequisites

17    to this being program technology.  The first is a program

18    participant participate in the invention.  So, in that sense I

19    agree "in part" --

20         THE COURT:  All right.  I just want to be sure.

21         MR. SCOTT:  Sit down?

22         THE COURT:  Nothing personal, but I just want to move

23    on to something that may be disputed.

24         So, now we come to the conceiving or reducing to

25    practice as part of the funded research project, and here don't

1    I have to look at when it is that it is reduced to practice, I

2    mean the temporal occasion upon which it is reduced to

3    practice?

4         MS. PIROZZOLO:  Well, your Honor, the definition says

5    conceived *or* reduced to practice.  So, I think you look at --

6         THE COURT:  I am interrupting you, and you will have

7    different views of their material, but conception and reduction

8    to practice are almost the same thing in respect of this

9    particular technology, aren't they?

10        MS. PIROZZOLO:  I don't agree, your Honor, and I'm

11   happy to -- we cited, I believe, in our brief conception is the

12   formation in the mind of the inventor of a definite and

13   permanent idea of the complete and operative invention, and the

14   Burroughs Wellcome case, which actually Gatekeeper cited,

15   specifically says that an inventor need not know that his

16   invention will work for conception to be complete.

17        THE COURT:  But conception does not occur unless one

18   has a mental picture of the structure of the chemical or is

19   able to define it by its method of preparation, its physical or

20   chemical properties or whatever characteristics sufficiently

21   distinguish it, which is to say, in this context pretty close

22   to reducing it to practice.  Yes, there is an idea.  Between

23   the idea and the reduction passes a shadow, but it is a

24   relatively narrow shadow, I think.

25        MS. PIROZZOLO:  Well, here, just the patent

1   application, if you look at Claim 1 of the application, it is

2   what's called the genus claim, so it includes millions of

3   compounds.  It's got a form chemical structure and that is what

4   Dr. Eck conceived, that basic structure of a compound when he

5   did his crystallography studies.  He said, We want to make

6   irreversible inhibitors that bind to a particular cysteine on

7   certain kinases, and that's what that class represents.

8           THE COURT:  All right.  But the question is, when do

9   we have conception and reduction to practice?  That is, I

10  guess, what I am getting at.  Is there a broad time period?

11          MS. PIROZZOLO:  Well, clearly --

12          THE COURT:  You say 2007, I guess.

13          MS. PIROZZOLO:  Well, Dr. Eck did his -- and I'm happy

14  to walk through the chronology, reciting to the record -- but

15  Dr. Eck did his studies on QAD-409 and Jak3 and another

16  inhibitor, an EGFR, and he superimposed those crystal

17  structures, and that's where he got his idea of making this

18  class of compounds.

19          THE COURT:  Isn't the real point for conception and

20  reduction to practice -- because I still do not distinguish

21  between them materially here -- isn't the real point when

22  someone discovers the connection between the synthesis of

23  WZ-4002 and its effect on the T790M mutation?  Isn't that the

24  point?

25          MS. PIROZZOLO:  Your Honor, this is a really

1  fundamental point that I want to be clear on.  No, we do not

2  think that's the issue in the case, because the claims -- there

3  is a fundamental disconnect, if anywhere, on the scope of the

4  patent application that's at issue.  This patent application

5  does not contain one claim to that particular compound.  That

6  is the lens through which -- if there are ships passing in the

7  night, that's why, because they say the IP is that compound and

8  the knowledge that that compound inhibited the Gatekeeper

9  mutation selectively.

10        THE COURT:  So, let us go to some sort of "but-for"

11  analysis.  If I were dealing with this and saying this is not

12  an agreement, this is an infringement, let us say that you have

13  some intellectual property that you can claim.  I think I

14  probably would say about the only claim you have of

15  infringement is 51.  That is about the only one that gets into

16  this kind of use of WZ4-002 and T790M, right?

17        MS. PIROZZOLO:  I don't think so, your Honor.  The

18  Claim No. 1 is a broad genus claim that includes --

19        THE COURT:  So, you say if it is a genus claim we get

20  everything that we can, even if it is not identified with some

21  specificity with respect to this kind of conception and

22  reduction to practice?

23        MS. PIROZZOLO:  Well, what you have in the patent,

24  just to be clear, is, you have the genus claim.  That's Claim

25  1.  That's very broad, millions of compounds, clearly not

1    limited to WZ-4002.

2         THE COURT:  But why shouldn't I limit it to that?

3    That is what you brought to the table, or that is what you had

4    in the mix.  Otherwise, and I will put this in a different way,

5    for public policy purposes you would be substantially reducing

6    the -- maybe proliferating a number of patent claims, one that

7    does precisely what you ask for and then one that asks for

8    everything else that is in the genus.

9         MS. PIROZZOLO:  Just to be clear, your Honor, the

10   context in which this arises is Novartis didn't file the patent

11   application.

12        THE COURT:  No, I understand that.  So, what I am

13   asking is I guess a more specific question about distorting the

14   application process for these kinds of claims.  Now, one way of

15   looking at it is this is kind of a "gotcha."  They make, on

16   your theory, a genus claim and you say, Well, on this one too,

17   in for a dime, in for a million dollars.

18        MS. PIROZZOLO:  I don't think it's a "gotcha," your

19   Honor, because if the funded research led to a broad class of

20   inhibitors that was then claimed by the applicants in a patent

21   application that was filed, under the contract we had an option

22   right to that patent application.  If they wanted to claim it

23   narrowly, then I guess that would be a different case, but

24   that's not what we are here about.  The patent application that

25   was filed is a very broad class of compounds.

1          And I want to say, just to be clear, we don't agree

2     that Novartis funding had no role in the compound WZ-4002,

3     because we believe that the record shows that the

4     crystallography structures that Dr. Toms was doing in Dr. Eck's

5     lab that were being exchanged with Dr. Gray's lab that Dr. Zhou

6     was using to make the different compounds in Spring of 2007,

7     that was Novartis-funded research.  So, we disagree with the

8     concept that --

9          THE COURT:  But the issue goes back for me, on this

10    aspect of it, to conception and reduction to practice.  So,

11    maybe they were working in this area, but we have to get to the

12    point of reduction to practice.

13         Let me just move off this, because you had mentioned

14    why we are here, and I want to be sure I understand why we are

15    here.

16         Let me assume for a moment, just to test this, that

17    you are correct and you have disclaimed on this.  What happens

18    then?  Basically they take it but you do not have any damages,

19    or are you suggesting that your right to this patent means that

20    you can prevent them from being involved in practicing this

21    invention?

22         MS. PIROZZOLO:  I think there is a fundamental

23    confusion here.  The only claim that Novartis is facing in this

24    case is as a defendant.  We are being accused of tortiously

25    interfering --

1          THE COURT:  No, I understand that.

2          MS. PIROZZOLO:  -- with Gatekeeper.  So, we have

3    washed our hands of this.  If you rule that we were entitled to

4    it, then summary judgment enters for us on the claim.  We are

5    not going to obviously assert the claims, because we have

6    waived the right to license it.  So, it's now Gatekeeper's

7    claim.

8          THE COURT:  Then it passes, under your theory, to the

9    next level of priority?

10         MS. PIROZZOLO:  Yes.  As I understand it, Dana-Farber

11   has given Gatekeeper rights to the patent application and

12   Novartis is no longer involved with it.

13         THE COURT:  Now, let me go back to this set of issues,

14   and I am trying to think of this in terms of maybe "but for" as

15   a way of dealing with it.  It takes a village to raise a child,

16   but "conception" tends to be a narrower transaction.  So, I am

17   focusing on that point of conception, or what I concede to be

18   that point of conception, and I want to understand from you

19   where you say that is, when you say that is.

20         MS. PIROZZOLO:  I say it was when Dr. Eck and Dr. Gray

21   met and decided to make this class of compounds based on the

22   QAD-409 scaffold, and that occurred -- no one had an exact

23   date -- but sometime in late 2006.

24         THE COURT:  And so, merely holding hands is

25   conception, to keep the metaphor?

1          MS. PIROZZOLO:  Well, what Dr. Eck said is that

2     basically once he -- and I should say this kind of moved along.

3     So, they had the first conversation and then they kept talking

4     and collaborating during 2007.  So, maybe conception of the

5     broad genus occurred at an earlier time than conception of some

6     of the other more specific claims, but that is when Dr. Eck

7     said those crystal structures that he had developed could be

8     used to design inhibitors that had particular features,

9     irreversible inhibitors with particular features that would

10    bond with the cysteine in the vicinity of the ATP binding

11    pocket.

12          I would note that Gatekeeper essentially describes the

13    invention as those structures that would bind -- I think it's

14    at page 7 of their brief; I'm looking for the reference -- but

15    that bind to the cysteine in the vicinity of the ATP binding

16    pocket.  So, once you had the idea to do that --

17          THE COURT:  Well, but isn't it more than simply

18    binding?  It is also some concept of displacing, for purposes

19    of binding, a different way of binding there, and have they

20    conceived that in 2007?

21          MS. PIROZZOLO:  Yes, your Honor.  Because if you look

22    at Dr. Eck's May 2007 presentation to Novartis describing his

23    research -- and I'm happy to put it up.  I brought a

24    presentation slide.

25          THE COURT:  Go ahead.

1          MS. PIROZZOLO:  It's slide 26.  Okay.  So, Dr. Eck was

2     doing a presentation to Novartis in May --

3          THE COURT:  Is this us or you that is causing the --

4          MS. PRICE:  I think it's on the monitor.

5          THE COURT:  I am seeing movement on the monitor.  If

6     it is us, we will get somebody from IT to fix it.

7          MS. PIROZZOLO:  I think it's you, because it's not

8     moving on our computer.  I don't know if you have the exhibits,

9     your Honor.

10          THE COURT:  I do.

11          MS. PIROZZOLO:  It's Exhibit 90.  And you can see on

12     the cover page it's a presentation.  Actually, your Honor, I

13     have a hard copy of our presentation, so maybe I can use that.

14          So, your Honor, it's page 26 in the presentation I

15     just handed up, but it is also Exhibit 90 in the book.

16          THE COURT:  I have got it now.

17          MS. PIROZZOLO:  And these are conclusions that Dr. Eck

18     stated, and just for context, this is a presentation Dr. Eck

19     gave to Novartis, and he talks about the increased affinity

20     of -- he talks about two mutants of EGFR, L858R and T790M for

21     ATP is a major factor in inhibitor resistance.  So, he

22     discovered that.

23          And then he has a second conclusion which I think

24     directly goes to your point, that, "Irreversible inhibitors, as

25     a class, overcome resistance through covalent binding."

1          So, he has stated the rationale for the design of this

2     particular class of inhibitors.  And if you look earlier in the

3     presentation, and this is at page 19 of the presentation, he

4     specifically has the structure of, he has his --

5          THE COURT:  Page 19?

6          MS. PIROZZOLO:  Page 19, your Honor.  You can see a

7     picture in the presentation where Dr. Eck puts his

8     co-crystallization studies there, and that's the figure on the

9     left-hand side of the page, and that is a picture of EGFR and

10    13-JAB, that's an inhibitor, superimposed on a

11    co-crystallization of Jak3 and the Novartis inhibitor QAD-409.

12    And he is pointing out on the right-hand side of the page what

13    this teaches me is the active site of binding is this

14    particular cysteine that's in both of these kinases.  And then

15    he has the figure of QAD-409, the chemical structure there.

16         And what he testified, he suggested to Dr. Gray was,

17    Why don't we use this scaffold, they call it, as a basis for

18    designing chemical compounds so that we can create irreversible

19    inhibitors for these kinases?

20         So, I put on the slide his deposition testimony:  "So,

21    we had determined that both Jak3 QAD-409 complex structure, and

22    also, the...EGFR in complex...", so that they both have the

23    Cysteine in this equivalent position.

24         And then when I asked Dr. Eck at his deposition what

25    he was trying to portray in this slide, he said, "So...using

1    structural modeling, this structural superposition basically

2    showed us sort of where one would want to attach the

3    irreversible warhead on this alternate scaffold QAD409 or

4    something like it, in order to efficiently react with the

5    target Cysteine to make an irreversible inhibitor."

6         So, he is doing much more than having an abstract idea

7    of compounds.  He is figuring out why he wants to make the

8    compounds he wants to make, he's actually suggesting a

9    particular scaffold to use, QAD-409, and that is precisely what

10   he told Dr. Gray about and gave to Dr. Gray, and Dr. Gray's lab

11   then went ahead and made compounds based on the scaffold, and

12   those very same compounds are claimed in the patent

13   application.

14        So, we don't think it's just an abstract -- I forget

15   the phrase Gatekeeper used -- an "inspiration."  It's much more

16   than an inspiration.  This is a very specific guideline.

17        And, in fact, another way to think about it is,

18   Dr. Eck is a coinventor on this patent.  Gatekeeper's story of

19   the invention doesn't really acknowledge any role he played.

20   His role, as he explained it, was coming up with the idea based

21   on co-crystallization studies that his lab was uniquely expert

22   in to make these types of compounds.

23        And so, to get to EGFR, if you look at page 20 of our

24   presentation, Dr. Eck also clearly explained why his work on

25   Jak3 was relevant to work on EGFR.  Those two compounds, as you

1    can see from his superimposed structure, have common

2    characteristics.  Both have, and he testified to this and the

3    quote is on page 20, a Methionine gatekeeper, as does the

4    gatekeeper mutation of the EGFR.  So, he says, "...irreversible

5    inhibitors of Jak3, may also be good irreversible inhibitors of

6    the T790 mutant of EGFR by virtue of the fact that both have

7    the same cysteine and also a methionine gatekeeper residue."

8           So, he was doing studies on EGFR, the Gatekeeper

9    mutant, he was also doing co-crystallization studies with

10   QAD-409.  He is the one, and this is on page 21 of our

11   presentation, who shared that modeling with Dr. Gray.  He

12   testified, "...the modeling that we did and that we shared with

13   Nathanael was based on looking at the co-crystal structure of

14   QAD409 with Jak3, superimposed on an EGFR structure in complex

15   with an irreversible inhibitor, the 13-jab compound..."  And

16   then he says, "that basically...became an exercise in, you

17   know, add this chemical group to...this scaffold in roughly

18   this position."

19          So, he was the one that was the mastermind of creating

20   this class of compounds.

21          And so, he explains how he met with Dr. Gray in his

22   office and explained this strategy to him, "...explained the

23   strategy which was obviously immediately obvious to him, and

24   expressed my interest in collaborating with him in developing

25   these irreversible inhibitors based on these and potentially

1    other scaffolds using this sort of strategy...informed by our,

2    at that time, unpublished structures of Jak3 with QAD-409 and

3    with EGFR with irreversible Parke-Davis inhibitor."

4           So, to get to your Honor's question about a "but-for"

5    analysis, the compounds that Dr. Gray's lab made in 2006 and

6    2007 originated with Dr. Eck and his Novartis-funded research

7    on co-crystallization studies.

8           And if you look at the next slide in our presentation,

9    that's slide 22, Dr. Zhou, who is the person that made all

10   these WZ compounds, his name is Wenjun Zhou, testified, "I saw

11   this crystal structure with QAD-409 as our basis for designing

12   the new compounds."  So, he was given the co-crystallization

13   structures that Dr. Eck had told Dr. Gray about, and he used

14   that idea and those structures to make the WZ compounds.

15          And if you turn to the next slide, your Honor, slide

16   23, you can see an example of one of the compounds Dr. Zhou

17   made.  So, I have put the NVP-QAD-409 on the left-hand side of

18   the slide and then the WZ-1-84 compound on the right, and you

19   can see how similar the structures of those compounds are,

20   because Dr. Zhou used those compounds to inform -- used the

21   idea Dr. Eck had given about starting with QAD-409 to make

22   compounds.

23          And I would just like to, if I could, address

24   something that Gatekeeper raises in its brief, which is, well,

25   WZ-1-84 has no bearing on this case, there are different kinds

1    of compounds that are at issue here.  Compounds that look just

2    like WZ-1-84 are right in the patent application.  If you look,

3    for example, at Table 1 of the patent application -- and I

4    don't know if you're able to toggle between slides, but we have

5    Table 1 at page 7 -- the compound that is in the patent

6    application as compound number 1-3 is virtually -- it's very

7    similar to WZ-1-84.  The only difference is, if you look at the

8    compound 1-3 there is a chlorine addition in the top right-hand

9    side, a little line going off.  That's the only difference

10   between the WZ-1-84 and the compound claimed in the patent

11   application.

12          So, it's very clear that Dr. Eck conceived of the

13   general idea of making this class of compounds and was the one

14   who communicated that idea to Dr. Gray, who in turn

15   communicated it to Dr. Zhou, who made the compounds, and then

16   they tested these compounds.

17          And I don't know if your Honor would like me to go on

18   to reduction to practice, but it's clear that --

19          THE COURT:  Yes, I do.

20          MS. PIROZZOLO:  -- that these compounds were --

21          THE COURT:  I do want you to reduce it to practice.

22          MS. PIROZZOLO:  Okay.  So, Gatekeeper's position is

23   that the compounds were not reduced to practice until Fall of

24   2008, when Dr. Janne did certain tests.  But there is evidence,

25   your Honor, undisputed evidence, that compounds that were in

1    this class that Dr. Zhou made, as suggested by Dr. Eck, had

2    already been shown to be inhibitors of kinases.

3         So, if you look at Dr. Gray's -- and we try to explain

4    this with reference to Dr. Gray's own grant application to the

5    National Science Foundation in July of 2007.  It's at page 27

6    of our presentation.  So, this is in July of 2007, so long

7    before Fall of 2008, obviously, Dr. Gray submits this

8    application, and the key pages of that are DFC 4917 to 73.

9    Basically there Dr. Gray explains how he used the crystal

10   structures of Jak3 and QAD-409 as the basis for developing

11   irreversible inhibitors, and he not only explains the rationale

12   for making that class of inhibitors but also provides data

13   showing some of the inhibitors were effective.  Does he provide

14   data for WZ-4002?  No, but he provides data for inhibitors in

15   the class.

16        THE COURT:  I have let you go on for a bit without

17   asking some questions, but I compare that to his, Dr. Gray's,

18   annual report in connection with this Novartis funding, and if

19   we are thinking of this as being the point at which it was

20   reduced to practice in his 2007 annual report, he says, A

21   couple of scaffolds also inhibit the Gatekeeper mutant of

22   basically T790M, showing that the approach is general, but he

23   says, This will serve as a good starting point.  He does not

24   talk about it as a reduction to practice in addressing

25   Novartis.  So, maybe it is possible to distinguish between

1   conception and reduction to practice, but reduction to practice

2   does not appear, at least from Dr. Gray's perspective, to be in

3   2007.

4          MS. PIROZZOLO:  Well, what Dr. Gray says that refers

5   to is a completely different project from the project that's

6   described in the National Science Foundation application.  He

7   says that was not related.

8          THE COURT:  Well, I guess he does.  On the other hand,

9   I am not sure what significance I attach to the *post hoc*

10  characterization of something that he said earlier, and he said

11  that he was not focused primarily on using the rational design

12  to prepare selective inhibitors.  So, we are at a point at

13  which we are before reduction to practice, at least by the

14  language that he is using, and the language that he is using

15  captures the reduction to practice of this invention, even as

16  broadly conceived as you have it.

17         MS. PIROZZOLO:  Well, has your Honor looked at the --

18  I'm referring to the National Science Foundation publication.

19         THE COURT:  I know you are, and I am now

20  cross-checking against what Dr. Gray is telling Novartis.

21         MS. PIROZZOLO:  Well, his explanation is that's a

22  different project.

23         THE COURT:  Well, that is the explanation, or

24  assertion is probably closer to it, and the question is how can

25  I reasonably believe that under these circumstances?  He says,

1    okay, that was something else.  If it is something else, I

2    cannot see it.

3         MS. PIROZZOLO:  Well, it's very confusing, to be

4    honest, because in the National Science Foundation grant he,

5    for example, has a picture of QAD-409, which is the Novartis

6    inhibitor, that he calls P1 for reasons he couldn't explain at

7    his deposition.

8         THE COURT:  All of that is true, but what I guess we

9    are getting at, without getting too much into the history and

10   also bias under these circumstances, but it is that there was

11   uncertainty at this point, there was not reduction to practice

12   at this point.  Even he concedes that.

13        MS. PIROZZOLO:  Your Honor, but he and Dr. Eck both

14   made presentations and disclosed data that had the rationale

15   for making the class of inhibitors, had the actual chemical

16   structures of the inhibitors and showed data to show that those

17   chemical compounds inhibited a variety of kinases.  So, under

18   any definition of "conception and reduction to practice" in the

19   Federal Circuit cases, those compounds were conceived and

20   reduced to practice by then.  So, what we have shown in the

21   record is --

22        THE COURT:  I do not want to put too much emphasis on

23   various ways before various audiences that Dr. Gray

24   characterizes this, but a good starting point is a reduction to

25   practice under Federal Circuit law?

1          MS. PIROZZOLO:  Well, under Federal Circuit law, the

2     definition of "reduction to practice" is -- I'm flipping in my

3     presentation because we have set out those cases at page 13 --

4     is, constructs a product or performs a process that is within

5     the scope of the patent, demonstrates the capacity of the

6     invented idea to achieve its intended purpose.  And in the

7     pharmaceutical arts it is sufficient, and we are actually using

8     the case Gatekeeper referred to in its brief, the Fujikawa

9     case, any pharmacological activity is sufficient.  So, as long

10    as you have data showing inhibition of kinases, which is what

11    the patent is directed to, you have had a reduction to

12    practice.

13          Gatekeeper wants to say, Well, no, you need to show

14    specific inhibition of the Gatekeeper mutant of EGFR, and you

15    need to show it's selective.  That's not the law, as far as the

16    reduction to practice of chemical composition claims; any

17    pharmacological activity is sufficient.  And Dr. Gray and

18    Dr. Eck collaborated in making the compounds that fall within

19    the scope of the patent, and they also tested them and showed

20    they had inhibition activity.

21          THE COURT:  Well, let me put it in a different way,

22    then.  Is the synthesizing of 150 new-type inhibitors covering

23    approximately 10 distinct scaffold classes sufficient to reduce

24    to practice under this language?  I have to say I have not

25    looked carefully at Fujikawa, but it seems a little

1    latitudinarian in its approach.  Any pharmacological activity

2    is a reduction to practice?

3           MS. PIROZZOLO:  Well, it's reduction to practice of

4    the compound claim, if you want to claim the compound, because

5    otherwise it would be confusing as to when the compound claim

6    was reduced to practice.  If it wasn't any pharmacological

7    activity would you have endless debates about, well, they

8    showed activity here but it really isn't important and they

9    showed activity there but it really wasn't important?

10           THE COURT:  Well, I do not know why you would not.

11   That just makes synthesis, any kind of synthesis, reduction to

12   practice, any pharmacological activity.

13           MS. PIROZZOLO:  The reason it's important here is

14   right in the patent claims.

15           THE COURT:  Is?  I am sorry.

16           MS. PIROZZOLO:  You can see the importance in the

17   patent claims.  The patent claims, Claim 1 is this broad genus,

18   Claim 51 is inhibition of any kinase, and then it goes on to

19   get a little more specific to kinases with a cysteine in a

20   certain position.  So, if you show inhibition activity in any

21   kinase that falls within the scope of Claim 51, you can't say,

22   Well, no, you needed to show it in the Gatekeeper mutant of

23   EGFR.  That would be contrary to what these patent claims are,

24   which is inhibition in any kinase --

25           THE COURT:  Why wouldn't I, then, carve through it and

1    say, okay, you get so much as where I started earlier, as

2    exists in 51, you do not get more, you do not get less, as a

3    way of cabining this from creeping over every kind of

4    pharmacological activity that these program participants

5    engaged in?

6         MS. PIROZZOLO:  Just to be clear, your Honor, we don't

7    want any of it.  All we are trying to show is that we didn't

8    tortiously interfere by virtue of claiming, Hey, we're entitled

9    to license this patent under the CRA.  That's the only issue

10   that's relevant to the claims against Novartis.

11        THE COURT:  Well, it may or may not be in the sense

12   that if I limit it to -- I am just saying Claim 51 as a way of

13   carving it out a little bit more carefully, you would still be

14   faced with a question of tortious interference, wouldn't you?

15        MS. PIROZZOLO:  Why is that, your Honor?

16        THE COURT:  Well, I will ask them.

17        MS. PIROZZOLO:  Well, because I feel like if the

18   claims are broad enough to cover the class of compounds --

19        THE COURT:  Let us assume that I say -- I am trying to

20   understand this more fully, and so I say not Claim 1; that is

21   just too broad.

22        MS. PIROZZOLO:  You're saying Claim 1 is invalid?

23        THE COURT:  No, because we are not talking about

24   invalidity here; we are simply talking about what is it that

25   you get to piggyback on.  You do not get to piggyback on Claim

1     1.  You do get to piggyback on Claim 51.

2          MS. PIROZZOLO:  Well, then, I think the implication is

3     we should have been asked about that and given the right to

4     exercise our license to Claim 53, and that never happened here,

5     and we certainly didn't tortiously interfere by saying, Hey,

6     you know, we think we may have rights because we funded a lot

7     of research on these subjects at Dana-Farber.

8          THE COURT:  All right.  Unless there is something more

9     that you want to say about this aspect --

10         MS. PIROZZOLO:  "This aspect" meaning conception --

11         THE COURT:  -- being conception and reduction to

12    practice.

13         MS. PIROZZOLO:  I think I have covered it, your Honor.

14         THE COURT:  So, let me just see if I have got a couple

15    of the -- I will not call them secondary -- but alternative

16    arguments clear under these circumstances.

17         I see the assertion that Gatekeeper says that Dr. Gray

18    sought and obtained the Steering Committee's consent with

19    respect to consulting as a consulting agreement.  Is that in

20    dispute or not?  I could not find the evidence of it.  I just

21    saw the reference, but I did not see any evidence in writing.

22         MS. PIROZZOLO:  I'm sorry.  There is no evidence that

23    Dr. Gray sought or obtained consent.

24         THE COURT:  Is it disputed?

25         MS. PIROZZOLO:  I don't think as a matter of

1  admissible evidence it is disputed.  I mean, Gatekeeper has

2  made allegations that --

3          THE COURT:  No.  Is it disputed by you that he did not

4  seek and obtain the consent for consultation?

5          MS. PIROZZOLO:  Our position is he did not seek

6  consent, and that is undisputed.

7          THE COURT:  Undisputed in the sense there is no

8  evidence of it one way or the other?

9          MS. PIROZZOLO:  No, no, no, no.  Sorry.

10          THE COURT:  Is there something in writing?  Is there

11  some piece of evidence that I can look at that touches on this

12  that you are aware of?  I understand your position being no,

13  there is not.

14          MS. PIROZZOLO:  Well, the best evidence is, and I will

15  try to get the cite, we asked Dr. Gray if he had sought and

16  obtained consent, and he did not.  He could not answer.  You

17  can read his answer.  He says he thinks he told someone at some

18  point.

19          THE COURT:  Is that all there is in this case, that is

20  what I guess I am getting at, in this record?

21          MS. PIROZZOLO:  Well, you also have Dr. Roberts'

22  testimony, which we cited.  Dr. Roberts was a member of the

23  Steering Committee and we cited his testimony where he says, in

24  essence, he learned that Novartis had not been told about

25  Gatekeeper and was surprised that had not been done and

1    understood why Novartis was upset about that.

2          THE COURT:  That is not admissible, either.  I should

3    not say that.  Gray's testimony is admissible for what it is

4    worth, which is not very much, and this other Roberts testimony

5    is not admissible at all.  He heard that there was a problem

6    and he was not surprised that Novartis was upset.

7          MS. PIROZZOLO:  I know we submitted a Declaration from

8    Dr. Sellers.  I think he said he learned of the invention not

9    until the Fall of 2009.  I don't know if he specifically

10   referenced when he learned of Gatekeeper.

11         THE COURT:  It is not even a matter of learning of

12   Gatekeeper.  It is a more specific, for me, anyway, issue of

13   when did he, if he did, seek and obtain the Committee's

14   consent.

15         MS. PIROZZOLO:  It's hard for us to prove a negative.

16   It just didn't happen.

17         THE COURT:  Well, so you say.  There must be some

18   proof of that or lack of proof; that is what I am getting at.

19   The short of it is, you have told me what you know about it.

20         MS. PIROZZOLO:  There is no record of it, no one has

21   testified that it occurred.  Even Dr. Gray, himself, didn't

22   testify he obtained consent when asked.

23         THE COURT:  Now, with respect to the research

24   agreement involving Dana-Farber, that is no longer an issue, I

25   take it, here.  Is that right or not?

1          MS. PIROZZOLO:  Yeah.  Our point with that is really

2     that by having these requirements of having people who are

3     entering into potentially conflicting business relationships,

4     by having the requirement that they notify the Steering

5     Committee, you can avoid situations like this where there is

6     disputes about who owns intellectual property, and those

7     procedures weren't followed here.

8          THE COURT:  Well, but the question I think is a more

9     specific one:  Is the option agreement a research support or

10    collaboration agreement?  You seem to have abandoned the theory

11    that it was in respect of Dana-Farber.

12         MS. PIROZZOLO:  Yes.  Our theory really is that

13    Gatekeeper has unclean hands or is not a bona fide purchaser of

14    the option agreement because Dr. Gray was a shareholder of

15    Gatekeeper, he was a founding shareholder.  It's a small,

16    closely held corporation.  Clearly Dr. Gray knew he was

17    supposed to obtain consent.  He did not.

18         THE COURT:  I just want to be sure that I am

19    understanding what the issues are.

20         Now, with respect to the Materials Transfer Agreement,

21    assume, as I think you have to, that I am going to treat that

22    as some sort of physical transfer of something.  Is there

23    anything in here left for you in terms of material transfer?

24         MS. PIROZZOLO:  There is.

25         THE COURT:  Tell me what it is.

1          MS. PIROZZOLO:  It was the crystallography studies

2     that Dr. Eck performed using QAD-409.  Those studies were

3     physically provided to Dr. Gray's lab.

4          THE COURT:  And that, as far as you are concerned, is

5     material.  I guess I have been conceiving the material in this

6     setting as being physical and not studies, meaning physical

7     stuff like QAD-409, that kind of thing.

8          MS. PIROZZOLO:  Well, I don't think there is evidence

9     of the actual material being transferred, you are correct.  But

10    Novartis transferred the material to Dr. Eck with an agreement

11    that specifically said, This is for use in the collaboration

12    and you can't --

13         THE COURT:  Right, but he did not transfer physical

14    material to someone else.  He let studies be done under your

15    theory, but he did not transfer some magic potion to someone

16    else.

17         MS. PIROZZOLO:  He transferred the results of the work

18    he obtained.

19         THE COURT:  And I just want to be sure that I am not

20    missing something when I say the results are not within the

21    scope of the MTA.  I do not know how I could read the MTA that

22    way.  It talks in terms of unused material being destroyed, and

23    that does not make any sense if we are talking about results.

24         MS. PIROZZOLO:  Well, we are relying on paragraph 7 of

25    the MTA, and it says, "[I]f in breach," and I'm excerpting a

1    bit -- it's on page 33 of our presentation -- "[I]f, in breach

2    of this Agreement, the Materials are not solely used for the

3    Studies..."

4         THE COURT:  Well, it begs the question of what the

5    materials are.

6         MS. PIROZZOLO:  Well, and in this case --

7         THE COURT:  It also talks about "unused material."

8    "Any unused material will be destroyed under the applicant's

9    supervision."  That strikes me as being the physical things,

10   physical, or chemicals or whatever.

11        MS. PIROZZOLO:  I think, your Honor, if you take

12   material that was provided to you under an MTA and then you

13   create crystal structures of them, you are not free to just

14   give other people those crystal structures without violating

15   the MTA.

16        THE COURT:  The crystal structures themselves?

17        MS. PIROZZOLO:  Well, the information about the

18   crystal structures.

19        THE COURT:  See, that is the difference; it is

20   derivative.

21        MS. PIROZZOLO:  But I don't think you're free --

22   otherwise it would be very easy to circumvent an MTA.

23        THE COURT:  No, it would not.  No.  The MTA serves a

24   particular office, and the particular office is that physical

25   substances will not be transferred.  Now, there may be other

1    ways of controlling the passage of information in respect of

2    the physical structures, but it is the physical structures that

3    we are talking about in the MTA, I think, unless there is

4    something more you would like to say about that.

5           MS. PIROZZOLO:  Well, I don't think that's the way

6    MTAs are understood, because otherwise --

7           THE COURT:  The other thing that you would like to say

8    is, "I do not agree with you."

9           MS. PIROZZOLO:  Well, otherwise you get the structure,

10   you look at it.  You don't actually give someone the structure,

11   but you tell someone everything you know about it so they can

12   make it themselves, and basically that wouldn't be a violation

13   of the MTA under your interpretation, and that that's a

14   complete circumvention of the --

15          THE COURT:  It is not entirely circumvention, because

16   you have another set of agreements that are supposed to control

17   it.  Now we are talking about what I consider to be a very

18   narrow agreement called a "Materials Transfer," because your

19   interpretation would be I think quite generous in dealing with

20   that.

21          I think we have reached an impasse with respect to

22   that, unless there is something else.

23          MS. PIROZZOLO:  Thank you, your Honor.

24          THE COURT:  So, let me understand the position of

25   Gatekeeper on these issues.

1          If I start with the patent application, and maybe even

2     if I step back a bit and ask how come Dr. Eck got on the

3     patent, what did he do to get on the patent?

4          MR. SCOTT:  Well, I think he did two things.  I think

5     he, and as Dr. Gray readily admits, suggested the idea of doing

6     a Jak3 irreversible inhibitor.

7          THE COURT:  So, maybe that is conception, then, right?

8          MR. SCOTT:  No, I don't think so, and I'll backtrack

9     to that once I answer this first question.

10         THE COURT:  Sure.

11         MR. SCOTT:  The second thing he did which was of some

12    significance was to do the crystallography of WZ-4002 with the

13    T790M EGFR in September, October and November of 2008 after the

14    reduction to practice.  Those are the two things he did.  And

15    one could argue that that crystallography process was part of

16    the reduction to practice.

17         THE COURT:  Well, if you do, haven't you drawn him in,

18    then, drawn Dr. Eck into a breach of his obligations under his

19    funding from Novartis?

20         MR. SCOTT:  I don't think simply drawing Dr. Eck into

21    the invention --

22         THE COURT:  I have been delicate.  Has he breached it?

23         MR. SCOTT:  No, I don't think so.

24         THE COURT:  Why not?  If he is using this set of

25    techniques that he has developed as a result of funding from

1   Novartis to assist, as you said kind of secondarily maybe that

2   is part of the reduction to practice, why isn't that included?

3           MR. SCOTT:  But doing crystallography is what his

4   Ph.D. is in.  There is no evidence that the process of doing

5   crystal structures has been derived from Novartis in any sense.

6           THE COURT:  Crystal structures in this context with

7   this set of materials and this set of compounds.

8           MR. SCOTT:  But the work done in the Fall of 2008

9   didn't involve any Novartis materials; it was WZ-4002 and the

10  T790M mutation.  There was no Novartis materials then.

11          THE COURT:  It does not necessarily have to be

12  Novartis materials, and I guess it goes back to this question

13  of "in part."

14          MR. SCOTT:  Yeah, I would like to go back to that

15  question.

16          THE COURT:  Yes, go ahead.

17          MR. SCOTT:  And I think we have done a lot of talking

18  this afternoon about the patent.  We are not here on a patent

19  case; we are here on a contract case.

20          THE COURT:  Well, but the patent case is an

21  embodiment, as far as I can see, or can be looked at as an

22  embodiment of the invention that is generated by the funding

23  from Novartis, and so it becomes a stalking horse.

24          I was thinking of this in a different sort of way.

25  Assume an appeal of whatever I do in this case.  Where does it

1    go?  I think it goes to the First Circuit, but I am not sure.

2             MR. SCOTT:  I'm sure it does.

3             THE COURT:  You are sure it does?

4             MR. SCOTT:  Sure it does.

5             THE COURT:  Any question on your part, Ms. Pirozzolo?

6             MS. PIROZZOLO:  I think that's correct, your Honor.

7             THE COURT:  So, in any event, I am interpreting

8    patents in a contract setting.  I think I have to.  Why

9    wouldn't I?

10            MR. SCOTT:  Let me suggest why you don't.

11            THE COURT:  All right.

12            MR. SCOTT:  We are here on a contract claim.  The

13   contract deals with rights to program technology.  "Program

14   technology" is defined in the contract as technology.

15   "Technology" is then defined as any invention, innovation or

16   discovery, whether protectable by a patent or not and whether

17   patentable or not, or copyrightable or any other form of

18   trade-secret protection.  The form of protection granted to the

19   invention is irrelevant to its definition as "program

20   technology."

21            THE COURT:  I agree, except for this:  That a core

22   kind of invention will be one that is protected by a patent.

23   Then we would not even be talking about whether we have an

24   invention or an innovation or a discovery, because it is

25   certifiably one of those; it is something that is protected by

1   a particular constitutional program.

2           MR. SCOTT:  I agree.  Let me just make one note.  What

3   we have here is a patent application; nothing has been issued

4   yet.

5           THE COURT:  Right.

6           MR. SCOTT:  And it is protected by a patent, but it is

7   protected with a number of other things in that patent.  That

8   patent is not limited to the invention.  It has got other

9   aspects to it.

10          THE COURT:  So, let me go back to what I was saying

11  about either 51 or 53.  If I say, for purposes of providing

12  metes and bounds of your authority, you can have everything

13  except Claim 51 or Claim 53.

14          MR. SCOTT:  I think if Claim 51 or 53 is the broad one

15  that applies to all kinases and incorporates the more general

16  definition, I agree.  That is, what this case has been about

17  from the very moment it was filed is mutant-specific

18  irreversible inhibitors of T790M EGFR.  That's the way the case

19  was pled by Novartis, by DFCI and by Gatekeeper and that's how

20  it has come to this Court.  That's how it was defined -- the

21  entitlement issue was initially raised by DFCI, and the

22  entitlement issue was defined as --

23          THE COURT:  What are you reading from now?

24          MR. SCOTT:  This is from DFCI's motion for a Rule 16

25  case management filed June 27th.  It's what initiated the

1    process that led us here today.  The issue was to which party,

2    Gatekeeper or Novartis, can and should Dana-Farber grant a

3    license to the WZ-4002 intellectual property?  That's what we

4    have been fighting about all along.

5           And indeed in Novartis's opening brief on this motion,

6    that's how they define the issue.  They state at page -- their

7    separate statement at fact number 136 is, "The '419 patent

8    application describes and claims chemical compounds that

9    inhibit the drug-resistant T790M 'gatekeeper' mutation of the

10   EGFR protein and less effectively inhibit the wild-type EGFR

11   protein.  Among those compounds is WZ-4002."

12          That's their statement of undisputed facts at 136 and

13   we didn't dispute it.  That's what we are here about, not about

14   all the many and varied other claims in that patent.  So, the

15   notion that they can claim, which we dispute, but even

16   accepting that they can claim some rights to WZ-1-84, we don't

17   care.  They can have it.  We are not interested in WZ-1-84 as a

18   Jak3 inhibitor, which is all they have claimed any rights to.

19          And I can address whether or not, in view of that, we

20   still have claims for interference.  I think we still do, but

21   that's not really before the Court here.

22          And I would also suggest, your Honor, that --

23          THE COURT:  Why isn't it something I have to think

24   about for present purposes under the Motions for Summary

25   Judgment?

1          MR. SCOTT:  Well, currently it's summary judgment on

2     an issue, the entitlement issue.  Nobody's done any discovery

3     on the interference claims.  We didn't take any depositions.

4          THE COURT:  Because it is so inextricably intertwined

5     with the question of damage.  It is damage.  That is what

6     interference is.

7          MR. SCOTT:  We have separated it, and we sit here

8     today with it separated.

9          The other point I would make, and one of the problems

10    of going down the approach suggested by Novartis is, if you

11    accept their version of what they are entitled to based on the

12    patent, Novartis would be entitled to every irreversible

13    inhibitor that comes out of DFCI that inhibits any kinase, and

14    that can't be.  That brings them way violative of the Bayh-Dole

15    Act.  They can't tie up every irreversible inhibitor that comes

16    out of DFCI.

17         And I would also suggest, your Honor, that any theory

18    of the invention that fails to account for two things can't be

19    right.  One, the theory of the invention has to account for the

20    delay between the May 30, 1997 invention or synthesis of

21    WZ-4002 and the discovery 18 months later that, lo and behold,

22    it has this mutant-specific irreversibly inhibitory effect on

23    T790M.  This notion of a straight-line series of inventions

24    from Dr. Eck using QAD-409, et cetera, et cetera, et cetera; it

25    doesn't make any sense, if that were the case, for WZ-4002 to

1    be synthesized and then to sit there for 18 months.  The fact

2    is, as Drs. Janne and Gray testified, that the library was

3    built, it sat there.  Dr. Gray didn't even think it was worth

4    trying to test its mutant-specific inhibitors against T790M.

5    It was Dr. Janne's idea in August and the invention was made in

6    September of 2008.

7           The second thing that Novartis' theory can't account

8    for, and this is on a more human scale than it is a science

9    scale because I think probably the human scale is more

10   informative, they can't account for the contemporaneous

11   evidence of Dr. Janne's and Dr. Gray's surprise and excitement

12   in September of 2008 that, lo and behold, we've hit upon

13   something.  If it is as Novartis suggests, that should have

14   been obvious to them months prior, but it wasn't and the

15   contemporaneous evidence proves it wasn't.

16          THE COURT:  I understand your resistance to the use of

17   the patent as a prism to refract light on this dispute, but let

18   us assume that, surprise to the contrary notwithstanding, they

19   claimed it in Claim 1.

20          MR. SCOTT:  "It" being?

21          THE COURT:  "It" being the mutant-specific effect of

22   inhibition that you find from WZ4002 on T790, is it?  I am

23   losing the numbers.

24          MR. SCOTT:  Yes.  Assume they claimed it in Claim 1.

25          THE COURT:  It is said to be a genus claim, covers all

1    kinds of things in this area, it is not just specific, and so

2    they had no idea how many things, how many species there were

3    in this genus.

4         MR. SCOTT:  Again, I don't think that the

5    claim-by-claim analysis of the patent is the right approach.  I

6    think it's an invention-by-invention analysis.  And if, in

7    fact, they made that claim in Claim 1, then I think this Court

8    should issue an order that Gatekeeper is entitled to that

9    invention and then deal with the application however it needs

10   to be dealt with in order to get us the invention we are

11   entitled to.

12        I think the entitlement issue comes first, so then we

13   will deal with the patent application.

14        THE COURT:  Well, but the question is what you are

15   entitled to, and they are making this argument, which I had

16   said was ethereal and still has certain of those qualities as I

17   listened to it, but it is pretty broad and it covers a lot of

18   territory, and the question for me is how properly to construe

19   a contract that purports to convey something that is mirrored

20   in the claims of the patent.  That is the issue that I am

21   trying to deal with.  I suppose I could ignore it altogether

22   and say that is a patent that does not have anything to do with

23   this case.  I am not sure I want to do that.

24        MR. SCOTT:  But I think it is the case, your Honor,

25   that it is common in industry to carve up a patent and to

1    license specific rights that are subparts of a patent, and all

2    we are entitled to is a license.  We don't care whether it's

3    the whole patent or whether it's a subset.

4         THE COURT:  I understand that.  The issue here is they

5    claim they are entitled to it too, and they claim that they are

6    entitled to it with priority over you.  That is why it is in a

7    peculiar posture.  I am dealing with a series of analogies, but

8    this is a priority case.

9         MR. SCOTT:  I think the analogies are dangerous,

10   because I don't think it's a priority case, and I think that

11   they are claiming different parts of that patent.  They are

12   claiming that they have some rights to the invention of WZ-1-84

13   as a Jak3 inhibitor, and they are saying, Oh, well, we find

14   that in the patent, and therefore we are entitled to the whole

15   patent.

16        But that is not the analysis that the CRA demands that

17   we and this Court undertake.  It's not a question of who is the

18   inventor and who has priority of a patent.  It's a question of

19   who has rights of program technology under the CRA, and if that

20   program technology happens to be bound to other kinds of

21   technology in a patent, that's of no moment under the CRA.

22   It's a question of who has rights to the invention.

23        And I think the invention here has been defined from

24   the outset:  mutant-specific irreversible inhibitors of T790M.

25        THE COURT:  All right.

1          MR. SCOTT:  If I can -- actually, I don't know if it's

2   worthwhile -- I can respond to some of the points.

3          THE COURT:  Go ahead, please.

4          MR. SCOTT:  I think there are some dangers, actually,

5   in a PowerPoint presentation and parts of evidence taken out of

6   context, so I'd urge the Court actually to look at the

7   underlying exhibits.

8          THE COURT:  I am sure you recognize that that is what

9   I have been trying to do.

10          MR. SCOTT:  One of the first slides that we saw was a

11   quote, "Irreversible inhibitors, as a class, overcome

12   resistance."  That was in that presentation.  I would like to

13   remind the Court that the efficacy of irreversible inhibitors

14   against the T790M mutation was described in the very first

15   article announcing the discovery of the T790M mutation, and Dr.

16   Janne testifies to that.  So, Dr. Eck was not making a

17   revolutionary or even a new suggestion.  Counsel suggested, Oh,

18   gee, that's preceded by just a few pages with a crystallization

19   structure of QAD-409 and suggests that there was a connection

20   between the two.

21          If you look at Dr. Eck's testimony about what that

22   Exhibit 90 is, and we cite to it in our papers, it's a

23   presentation of two different presentations:  One, here's how

24   we developed a Jak3 irreversible inhibitor; and, two, here's

25   our discovery about the T790M means of resistance.  And to

1    combine those two presentations the way it was suggested

2    earlier I don't think is a fair characterization of the

3    document.

4          Dr. Eck's testimony about locating the place where

5    binding can occur, that was testimony regarding the development

6    of, again, a Jak3 inhibitor.

7          Counsel quoted from the testimony of Dr. Zhou about

8    QAD-409 being the basis.  That was at page 24 of Dr. Zhou's

9    testimony.  And I would like to, if you just continue down that

10   page at line 21:  "Okay."

11         THE COURT:  Where is he in the-

12         MR. SCOTT:  I think it's the last tab.  I don't know.

13   Do they go to F?  I think it's F.

14         MS. PIROZZOLO:  Exhibit F.

15         MR. SCOTT:  Exhibit F.  I have tabbed mine by names.

16         THE COURT:  F is Timothy Scott.

17         MR. SCOTT:  I'm sorry.  It's probably not so important

18   a point to take up all this time.

19         THE COURT:  Well, you mentioned it so I am trying to

20   read all of the deposition testimony.

21         MR. SCOTT:  I appreciate it.  It's not as bad as it

22   could be.

23         THE COURT:  Pardon me?

24         MR. SCOTT:  It's not as bad as it could be.

25         THE COURT:  It never is, in my experience.  But go

1    ahead.

2          MR. SCOTT:  Page 24, line 21.  The quote that counsel

3    quoted was from lines 1 to 8.  I would like to continue.

4    Actually, you can pick it up at line 12.

5          "Okay.  At the top it says 'Strategy for

6    identification of mutant-selective irreversible inhibitors of

7    T790M mutant EGFR."  That's us.

8          Answer:  "Uh-huh."

9          "Okay.  And then at the bottom it lists some more of

10   your compounds.  Do you see?"

11         "Yes."

12         "WZ3146, 4002 and WZ8040."

13         "Yes."

14         "Okay.  Were you involved in the strategy for

15   identification of mutant-selective irreversible inhibitors?"

16         "Yes, I was."

17         "Please describe the strategy."

18         "So, based on the pyrimidine," which is different than

19   a purine; the QAD-409 is a purine," based on the pyrimidine...

20   I made several -- several compounds.  And so we actually --

21   Dr. Gray published a paper about EGFR/Bmx cross-reactivity.  So

22   we collaborated with Dr. Pasi Janne's lab to test those

23   compounds.  Then after -- after we got the results, we

24   redesigned and remake more compounds to optimize the properties

25   of our compounds."

1      He later testifies this was the process that took

2  place in September 2008.  It has little or nothing to do with

3  QAD-409 or WZ-1-84.  Counsel pointed out that WZ-1-84 appears

4  in the patent except for I guess there's only one little

5  difference, there's this chlorine molecule.  Well, in the world

6  of chemistry a little chlorine molecule is a significant thing.

7      THE COURT:  It is like, as Mark Twain said, There is a

8  big difference between fire and a firefly.

9      MR. SCOTT:  Yes.

10     Finally, the issue of whether Dr. Gray sought consent,

11  Dr. Gray addresses that issue at page 35 of his testimony.

12     THE COURT:  Which is?

13     MS. PIROZZOLO:  D.

14     MR. SCOTT:  Tab D, I'm told.

15     THE COURT:  And the page again?

16     MR. SCOTT:  Page 35, beginning with line 16:

17     "Okay.  Do you have any recollection of whether you

18  informed the steering committee that you were founding

19  Gatekeeper before you, in fact, found Gatekeeper?"

20     "I can't remember the time in between when I talked to

21  the steering committee, Livingston and Roberts, about founding

22  that, vis-à-vis when the company was started."

23     So, what he says is, I talked to them, but I can't put

24  it before or after the founding.

25     THE COURT:  But that is not all of what he is supposed

1    to do.  It is supposed to be in writing, isn't it?

2            MR. SCOTT:  I don't think so, because if you consult

3    the testimony of Dr. Roberts, and that is at pages 7 and 8, the

4    questions and answers go as follows:  Question:

5            THE COURT:  Just a moment.

6            MR. SCOTT:  Sorry.

7            THE COURT:  I want to be sure I am picking up

8    everything here.

9            MR. SCOTT:  Question:  "Is there a mechanism for a

10   principal investigator to bring matters to the attention of the

11   steering committee -- "

12           THE COURT:  Hold on just a second.  I am going back

13   and forth between things.

14           MR. SCOTT:  Sorry.

15           THE COURT:  Roberts is which one, which tab?

16           MS. PIROZZOLO:  Tab E, your Honor.

17           THE COURT:  And the page number again?

18           MR. SCOTT:  7 to 8.

19           Question:  "Is there a mechanism for a principal

20   investigator to bring matters to the attention of the steering

21   committee?"

22           Answer:  "Yes."

23           Question:  "Can you describe that mechanism for me,

24   please."

25           Answer:  "It's informal.  But in general, a PI would

1    contact either...Dennis Lynch, who acts as David's lieutenant,

2    as it were, and is more involved in the day-to-day interaction

3    with Novartis than either David or I am."

4         Question:  "And once an issue was brought to the

5    attention of Dr. Livingston, you, or Dr. Lynch, who would be

6    responsible, then, for following up and bringing it to the

7    attention of the full steering committee?"

8         "This, again, is an informal process and it could

9    happen in several ways.  It could happen via a communication

10   between either myself or David -- more likely David -- and Bill

11   Sellers.  But the most likely means would be for Dennis Lynch

12   to contact...Phil Gotwals, Bill Sellers' lieutenant."

13        The point is that Dr. Gray brought this to the

14   attention the way people had operated under that CRA

15   throughout, which is by --

16        THE COURT:  Well, that may be the way they operate,

17   but Section One of the Agreement says that you inform them and

18   obtain prior written approval from the steering committee to

19   enter into an arrangement, and I take it that there is no

20   evidence of a prior written --

21        MR. SCOTT:  No, there is not.

22        THE COURT:  So, what you are saying is there is a

23   custom and practice that has effectively put a gloss on this

24   prior written approval.

25        MR. SCOTT:  Yes.  And I would add to that, your Honor,

1    that the addendum of the Dana-Farber terms to that Consulting

2    Agreement expressly provide that nothing in the Consulting

3    Agreement shall give Novartis any rights in any invention or

4    even any priority towards any rights to any invention.  So,

5    whatever the significance of the Consulting Agreement vis-à-vis

6    Dr. Gray personally, it doesn't have significance with respect

7    to granting rights to Novartis to any invention made at

8    Dana-Farber.

9              THE COURT:  So, it is immaterial in this setting?

10             MR. SCOTT:  Yes.

11             THE COURT:  All right.  I understand that.

12             MR. SCOTT:  Thank you.

13             THE COURT:  Ms. Pirozzolo, anything else you want to

14   add?

15             MS. PIROZZOLO:  Yes, your Honor, I would like to

16   respond briefly.  The first point:  I really do think you have

17   to look at the patent application at issue to define "program

18   technology," and that is because the dispute here is was

19   Novartis guilty of tortious interference by virtue of asserting

20   rights --

21             THE COURT:  Let me pause.  I had not thought to go

22   back to either the Complaint or the Rule 16 statement, but do

23   you dispute that we are dealing with entitlement to

24   mutant-specific inhibitors?

25             MS. PIROZZOLO:  That is included in the invention,

1    but, for example, one issue -- Gatekeeper appears to concede

2    that Novartis funded work on Jak3 inhibitors that are included

3    in this patent application.  If that is the case, how could we

4    have tortiously interfered by virtue of asserting rights to

5    license at least those inventions?

6            THE COURT:  Well, see, I think it is the case that I

7    am limited on this Motion for Summary Judgment to the question

8    of entitlement; that is to say, the issue here is not whether

9    you interfere but who is entitled to what, and if I

10   substantially constrain that entitlement under these

11   circumstances, if I substantially constrain your entitlement

12   under those circumstances, then we move on to this question of

13   interference.

14           I do not know whether you interfered or not.  I am not

15   really being asked to say that yet.  You are apprehensive that

16   you might have, that is why you brought a declaratory judgment

17   action, and to the degree that I have to decide this as a

18   declaratory judgment action prudentially, that is, I have

19   discretion not to deal with things that are not cases in

20   controversy, as I assume there is a real issue about

21   interference.

22           MS. PIROZZOLO:  Well, our declaratory judgment action

23   is now moot because we have ceded the rights to the invention.

24   So, the only claim as a defendant on the tortious interference

25   claim --

1          THE COURT:  The question of interference is not

2     directly before me.

3          MS. PIROZZOLO:  Well, except the elements of tortious

4     interference include did they have a contract, and if we had

5     rights in this patent application then we had prior rights and

6     they didn't have rights.  So, entitlement would resolve the

7     tortious interference claim, and it's our position that it

8     does.

9          THE COURT:  Well, if you prevail on it, it will.  If

10    you do not prevail on it, then we move on to the question of

11    the nature of interference and damages associated with it.

12         MS. PIROZZOLO:  Well, except if your Honor finds I

13    believe that we were entitled to part of the patent

14    application, which I sense is a possibility, then clearly we

15    were entitled to part, so we couldn't have tortiously

16    interfered by virtue of asserting that right --

17         THE COURT:  I do not know the answer to --

18         MS. PIROZZOLO:  -- and that should dispose of the

19    claim against us.

20         THE COURT:  It should, but it does not do it on this

21    Motion for Summary Judgment.  It becomes a second Motion for

22    Summary Judgment, I suppose.

23         MS. PIROZZOLO:  But, your Honor, the thing that was

24    being licensed here, the subject of the option agreement was a

25    patent application.  So, the issue is whether Dana-Farber had

1   to offer it to us.

2            THE COURT:  No.  It was an invention, It was not the

3   patent application.  It was an invention or discovery or

4   something like that.

5            MS. PIROZZOLO:  Well, except that the operative

6   provisions of the Collaboration Agreement are that we have a

7   right to an option to license program technology.

8            THE COURT:  Right, but that license could proceed from

9   a patent or from any of a number of forms of protected or

10  intellectual property.  It may not be a patent.  Whether or not

11  protected by patent, copyright or trade secret law or

12  otherwise.

13           I am not foreclosing the idea that the patent is the

14  cat's paw for whatever intellectual property is involved here

15  and it is the proper way for me to conceive it and provide a

16  definition, but it does not get incorporated by reference

17  immediately.  That is the point, I guess.

18           MS. PIROZZOLO:  I guess I think the problem you have

19  if you don't look at it as a patent is what is supposed to

20  happen when Dana-Farber files a patent application.  In our

21  view, what is supposed to happen is, if we funded any of the

22  inventions in that they have to offer it to us to license under

23  the CRA.  That's kind of the point of all those provisions.

24           THE COURT:  Not to play too much on current events,

25  but this is the Ronald Reagan, "It is my microphone, so I get

1    to use it."

2            MS. PIROZZOLO:  Well, the other thing is, your Honor,

3    the fire/firefly example you used, Gatekeeper has made a big

4    point of, well, these are pyrimidines, not purines, but the

5    compound that I pointed you to in Table 1 is a purine.  That's

6    our point, is, this patent application is covering a lot of

7    technology.

8            THE COURT:  I do not treat I guess it was Dr. Zhou's

9    testimony as being conclusive on that issue, whether he

10   professed to having some lack of recollection with respect to

11   this, certain aspects of this.

12           MS. PIROZZOLO:  But all I'm pointing out is you can

13   look at the patent application and you can see that the

14   compounds include both pyrimidine --

15           THE COURT:  Like the deposition transcript, I will

16   look at the patent application.

17           MS. PIROZZOLO:  -- and purine compounds.

18           And I just wanted to point out, when you asked the

19   question about Dr. Eck's role in the invention, the answer was

20   the ideas provided and then work done after reduction to

21   practice, which I don't think qualifies as an inventive

22   contribution.  So, Dr. Eck did something here.

23           THE COURT:  Well, what is the impact of that?  Let us

24   assume that three people who work together closely decide for

25   various interpersonal relations that they will announce that

1    the three of them are the inventors.  Now, I suppose I can use

2    that as a form of impeachment that Dr. Eck must have done

3    something to do that.  On the other hand, maybe they felt

4    strongly about their relationship and so they decided, We'll

5    make all three of us joint inventors under these circumstances.

6    What is it to you?

7          MS. PIROZZOLO:  Well, actually I think we mention this

8    in our papers, but Dr. Eck testified that he found out about

9    the patent application accidentally.  Dr. Gray had been taking

10   a lead in the patent application.  He filed the patent

11   application without Dr. Eck on it.  Dr. Eck then got in touch

12   with the patent attorney and explained his role in the

13   invention and was added as an inventor.

14         THE COURT:  But when he provided the explanation we do

15   not have his testimony of his explanation of what he did that

16   ties it to Novartis funding, do we?

17         MS. PIROZZOLO:  Well, we have cited his testimony

18   about his work on conceiving this class of compounds as part of

19   his Novartis-funded research project in 2005 and 2006 --

20         THE COURT:  Right.

21         MS. PIROZZOLO:  -- and that he communicated that idea

22   to Dr. Gray.

23         THE COURT:  But we are back to conception and

24   reduction to practice.  That is the point.  I think it is a

25   terrific jury argument.  I am not sure it does very much on

1    summary judgment that you have got some uncertainty about who

2    the inventor is and what the contributions or relative

3    contributions of the inventors are, even when the inventors

4    have their own explanations of what they are.

5           MS. PIROZZOLO:  Well, for summary judgment we are

6    relying on evidence of what Dr. Eck provided with regard to the

7    development of these compounds, not the mere fact that he was

8    added as inventor.  I was just responding to your comment.

9    Maybe they are just buddies and he got thrown on the patent

10   application because they're friends and they thought that was

11   the collegial thing to do.  The evidence actually suggests

12   otherwise.

13          THE COURT:  All right.

14          MS. PIROZZOLO:  Thank you, your Honor.

15          THE COURT:  Anything else?

16          MR. SCOTT:  Your Honor, two more things.  Ten seconds.

17          We don't concede on WZ-1-84; we don't think it's

18   Novartis-funded.  I could get into that, if you like, but since

19   we are running out of time, the second thing is, there were

20   objections made to some of the evidence we submitted.  I can

21   address that.

22          THE COURT:  As I presently conceive what I am going to

23   be doing with this, and I have done a certain amount of work, I

24   do not think that the evidentiary objections are going to make

25   a difference.

1          MR. SCOTT:  Okay.  I have responses I can hand up to

2     the Court, if you want to read them, but, in essence, they say

3     they are all admissions and under the revised Rule 56, the

4     question is not --

5          THE COURT:  You can paper the record.  Submit it in

6     the ordinary course is all I would say with respect to that.

7          MR. SCOTT:  Okay.  Thank you, your Honor.

8          THE COURT:  Thank you.  So, we will be in recess in

9     this matter.

10          THE CLERK:  All rise.

11     (The Honorable Court exited the courtroom at 4:00 p.m.)

12     (WHEREUPON, the proceedings adjourned at 4:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Reporter

5     of the United States District Court, do hereby certify that the

6     foregoing transcript constitutes, to the best of my skill and

7     ability, a true and accurate transcription of my stenotype

8     notes taken in the matter of *Dana-Farber Cancer Inst. v.*

9     *Gatekeeper Pharmaceuticals, Inc., et al.*, No.

10    1:10-cv-11613-DPW.

11

12

13

14

15

16    Date: January 19, 2012          /s/ *Brenda K. Hancock*

17                                     Brenda K. Hancock, RMR, CRR

18                                     Official Court Reporter

19

20

21

22

23

24

25